## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LABORERS' PENSION FUND and | ) | |
| LABORERS' WELFARE FUND OF THE | ) | |
| HEALTH AND WELFARE DEPARTMENT | ) | |
| OF THE CONSTRUCTION AND GENERAL | ) | |
| LABORERS' DISTRICT COUNCIL OF | ) | |
| CHICAGO AND VICINITY, and JAMES S. | ) | |
| JORGENSEN, Administrator of the Funds, | ) | |
| Plaintiffs, | ) | Case No. 08 C 859 |
| v. | ) | |
| | ) | Judge Zagel |
| TROTTER LANDSCAPE COMPANY, INC., an | ) | |
| Illinois corporation, | ) | |
| Defendant. | ) | |

### MOTION FOR ORDER OF DEFAULT

Now come Plaintiffs, Laborers' Pension Fund and Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, and James S. Jorgensen collectively referred to hereinafter as the "Funds"), by and through their attorney, Jerrod Olszewski, and hereby move for an Order of Default against Defendant Trotter Landscape Company, Inc. (hereinafter "Company"). In support of this Motion, Plaintiffs state as follows:

1.    Funds filed their Complaint on February 8, 2008 seeking to compel the Company to submit benefits and dues reports and contributions from November, 2007 forward, and to obtain and maintain a surety bond.

2.    Service of Summons and Complaint was effected on Defendant Company on February 25, 2008. A true and accurate copy of the Affidavit of Service is attached hereto as Exhibit A.

3.    Company has failed to file an Answer or otherwise plead. Accordingly,

Defendant Company is in default.

4.      Pursuant to Section 502(g)(2) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1132(g)(2), Section 301 of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. §185, the Agreement, the Power House Maintenance Modification Agreement, and the Funds' respective Agreements and Declarations of Trust, Defendant Company should be ordered to submit its November, 2007 forward benefits and dues reports and contributions, and to obtain and maintain a $5,000.00 surety bond.  See Affidavit of Rocco Marcello filed contemporaneously herewith and attached hereto as Exhibit B, ¶¶ 1-7.

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order finding Defendant Trotter Landscape Company, Inc. in default, ordering it to submit its November, 2007 forward benefits and dues reports and contributions, and to obtain and maintain a $5,000.00 surety bond.  Further, Plaintiffs request that this Court retain jurisdiction to enter a judgment for the amounts due and owing as pleaded in the Complaint, and as revealed by the November, 2007 forward reports, including delinquent contributions and dues, liquidated damages, interest, and attorneys' fees and costs incurred by Plaintiffs in this matter pursuant to the Funds' respective Agreements and Declarations of Trust, and 29 U.S.C. § 1132(g)(2).

March 19, 2008                                  Respectfully submitted,
                                                Laborers' Pension Fund, et al.

                                                By: /s/ Jerrod Olszewski

Jerrod Olszewski
Office of Funds Counsel
111 W. Jackson Blvd., Suite 1415
Chicago, IL  60604
(312) 692-1540

AO 440  (Rev. 05/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

**SUMMONS IN A CIVIL CASE**

LABORERS' PENSION FUND AND LABORERS'
WELFARE FUND OF THE HEALTH AND
WELFARE DEPARTMENT, ETC., ET AL.,

V.

TROTTER LANDSCAPE COMPANY, INC.,
an Illinois corporation,

CASE NUMBER:

ASSIGNED JUDGE:

DESIGNATED
MAGISTRATE JUDGE:

# 08 C 859

**JUDGE ZAGEL
MAGISTRATE JUDGE NOLAN**

TO: (Name and address of Defendant)

Trotter Landscape Company, Inc.
c/o John V. Hanson, Registered Agent
1802 N. Division Street
#04 POB 825
Morris, IL 60450

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Patrick T. Wallace, Jerrod Olszewski
Christina Krivanek, Amy N. Carollo
Charles F. Ingrassia
Office of Fund Counsel
53 W. Jackson Blvd., Suite 550
Chicago, IL  60604

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this
summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint.  You must also file your answer with the Clerk of this Court within a reasonable period of time
after service.

**Michael W. Dobbins, Clerk**

**(By) DEPUTY CLERK**

**February 8, 2008**

**Date**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **LABORERS' PENSION FUND; ET AL** | | COURT DATE: |
| | PLAINTIFF(S) | Case No.<br>**08 C 859** |
| vs. | | |
| **TROTTER LANDSCAPE COMPANY, INC.** | | AFFIDAVIT OF SERVICE OF:<br>**SUMMONS & COMPLAINT** |
| | DEFENDANT(S) | |

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On **Feb 25, 2008**, at **10:03 AM**, I served the above described documents upon **TROTTER LANDSCAPE COMPANY, INC.** as shown below:

**CORPORATE SERVICE** was made by leaving a true and correct copy of the documents with **SARAH SNYDER / SECRETARY**, an officer, managing agent or authorized agent of the within named company.

Said service was effected at **1802 N. DIVISION ST. #04 POB 825, MORRIS, IL 60450**.

**DESCRIPTION:**  Gender: **F**  Race: **WHITE**  Age: **30**  Hgt: **5'7"**  Wgt: **125**  Hair: **BLONDE**  Glasses: **NO**

I declare under penalties of perjury that the information contained herein is true and correct.

*[signature]*

**Karen Crohan, Lic #: 117-001119**
**Judicial Attorney Services, Inc.**
**2100 Manchester Rd., Ste 900**
**Wheaton, IL 60187**
**(630) 221-9007**

SUBSCRIBED AND SWORN to before me this 25th day of February, 2008

*[signature]* Joan C. Harenberg

```
OFFICIAL SEAL
JOAN C HARENBERG
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 07/13/09
```

NOTARY PUBLIC

| | | |
|---|---|---|
| CLIENT NAME:<br>**Laborers Pension and Welfare Funds\***<br>FILE #: | ORIGINAL PROOF OF SERVICE | TRACKING #<br>**36610** |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| LABORERS' PENSION FUND and<br>LABORERS' WELFARE FUND OF THE<br>HEALTH AND WELFARE DEPARTMENT<br>OF THE CONSTRUCTION AND GENERAL<br>LABORERS' DISTRICT COUNCIL OF<br>CHICAGO AND VICINITY, and JAMES S.<br>JORGENSEN, Administrator of the Funds,<br>                    Plaintiffs,<br><br>              v.<br><br>TROTTER LANDSCAPE COMPANY, INC., an<br>Illinois corporation,<br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 08 C 859<br>)<br>)     Judge Zagel<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF ROCCO MARCELLO

ROCCO MARCELLO, being first duly sworn on oath, deposes and states as follows:

1.      I am a Field Representative employed by the Laborers' Pension Fund and the Laborers' Welfare Fund of the Construction and General Laborers' District Council of Chicago and Vicinity (hereinafter collectively referred to as the "Funds"), Plaintiffs in the above-referenced action. My responsibilities include oversight of the collection of amounts owed by Defendant, Trotter Landscape Company, Inc., (hereinafter the "Company"). This Affidavit is submitted in support of the Laborers' Funds' Motion for Order of Default. I have personal knowledge regarding the statements contained herein.

2.      On August 21, 2000, the Company signed a PHMMA Adherence Agreement ("Agreement") with the Construction and General Laborers' District Council of Chicago and Vicinity ("District Council") and Laborers' Local 75. A true and accurate copy of the Agreement is attached hereto as Exhibit B-1. Pursuant to the terms



EXHIBIT
B

of the Agreement, the Company is bound to the terms of the Power House Maintenance Modification Agreement which incorporates by reference the Funds' respective Agreements and Declarations of Trust.

3.      Pursuant to agreement, the Funds have been duly authorized to act as collection agents on behalf of the District Council for union dues owed to the District Council.

4.      The Agreement, the Power House Maintenance Modification Agreement, and the Funds' respective Agreements and Declarations of Trust to which the Company is bound require that the Company submit benefit reports and contribution payments by the tenth day of the following month.  Payments which are not received within thirty days of this date are assessed liquidated damages in the amount of 20 percent of the principal amount of delinquent contributions, and interest at a rate of prime plus 2 percent as charged by JPMorgan Chase Bank from the date of delinquency forward.  The Agreement and the Funds' respective Agreements and Declarations of Trust also obligate the Company to submit its books and records to the Funds for periodic audits to determine benefit contribution compliance, and to obtain and maintain a $5,000.00 surety bond.  A copy of the Power House Maintenance Modification Agreement is attached as Exhibit B-2; a copy of the relevant portions of the Amended Agreement and Declaration of Trust creating the Laborers' Pension Fund is attached as Exhibit B-3; a copy of the relevant portions of the Amended Health and Welfare Department of the Construction and General Laborers' District Council is attached as Exhibit B-4, and a copy of the relevant portions of the Agreement and Declaration of Trust Establishing the Construction and General Laborers' District Council of Chicago and Vicinity Training

Trust Fund is attached as Exhibit B-5.

5.     The Company has failed to submit benefit reports and contributions for the months of November, 2007 forward.

6.     The Company has failed to submit union dues reports and contributions for the period of November, 2007 forward.

7.     The Company has failed to obtain and maintain a $5,000.00 bond.


FURTHER AFFIANT SAYETH NAUGHT.

Rocco Marcello

Subscribed and sworn to before me
this 19th day of March, 2008.

Notary Public

"OFFICIAL SEAL"
Susan M. Diforti
Notary Public, State of Illinois
My Commission Expires Oct. 5, 2008

3

Fax from : 17089477295    LABORS FIELD DEPT    02-07-08 12.21p    P9.

10/05/00    10:25    NO.990  P02
10-05-2000 10:05AM    FROM    Case 1:08-cv-01953    Document 11    Filed 03/19/2008    Page 8 of 45

20145

## PHMMA ADHERENCE AGREEMENT

The undersigned signatory unions and contractor hereby agree to the following with respect to work performed for Commonwealth Edison Company at its generating stations within the territorial boundary of the Will & Grundy County Building and Construction Trades Council.

(1) Each of the undersigned unions agrees (a) that all employees it represents who perform work at a Commonwealth Edison site shall work under the terms of the Power House Maintenance Modification Agreement dated 1/1/83 Revised 12/15/94 ("PHMMA") and (b) that said unions will be bound to the PHMMA with respect to such work.

(2) The signatory contractor agrees that with respect to work performed by any employees represented by the signatory unions, the contractor will be bound by the PHMMA.

(3) It is understood that a reproduced signature shall have the same force and effect as an original signature. An officer of the above building trades organization shall be the agent of the undersigned Unions with respect to the delivery of the fully executed copies of this PHMMA Adherence Agreement to the contractor.

16308

### UNIONS

ASBESTOS WORKERS No. 17
By: _Michael O'Reisl_

BOILERMAKERS No. 1
By: _John Skennett_

BRICKLAYERS No. 14
By: _Berard Cancieta_

CARPENTERS No. 916
By: _Kenneth Borg_

CARPENTERS No. 174
By: _Kenneth Borg_

CEMENT MASONS No. 161
By: _Charles Frantini_

ELECTRICIANS No. 176
By: _Lynn Fieldman_

GLAZIERS No. 27
By: _Leonard Mantha_

IRON WORKERS No. 483
By: _James Steel_

IRON WORKERS No. 444
By: _Howard R. Norberg_

LABORERS No. 75
By: _Joseph Lombardo Jr._

LATHERS No. 74-L
By: _Kenneth Borg_

MILLWRIGHTS No. 1693
By: _Kenneth Borg_

OPERATING ENGINEERS No. 150
By: _Michael J. Quigley_

PAINTERS No. 33
By: _Anthony Frangella_

PLASTERS No.
By: _Fred Hedley_

PLUMBERS No. 130
By: _Gerald M. Gilbert_

ROOFERS No. 11
By: _Joseph Sullivan_

SHEET METAL WORKERS No. 265
By: _George Sette_

SPRINKLER FITTERS No. 669
By: _Alfred Klipp_ Bus. Agent
For Bus. Agent Gerald Singleton

SPRINKLER FITTERS No. 281
By: _Gerald M. Gilbert_

TEAMSTERS No. 179
By: _Robert White_

TECHNICAL ENGINEER No. 130
By: _Gerald M. Gilbert_

### CONTRACTOR

Company: _Tretter_ _Landscape Co Inc_

By: _David White_    Title: _President_    Dated: _8-21-00_



EXHIBIT

B-1

tabbies

# POWER HOUSE MAINTENANCE

# MODIFICATION AGREEMENT BY CONTRACT

# FOR

# COMMONWEALTH EDISON COMPANY

# POWER GENERATING FACILITIES

Dated 1/1/83
Revised 12/15/94

**QUICK FAX OfficeMax**

| Date: | # Of Pages /O | From: |
|---|---|---|
| To: | | Co./Dept. |
| Co./Dept. *Pat Walkae* | | Fax: |
| Fax | | Phone: |
| Phone: | | E-Mail: |
| Note: | | |


EXHIBIT
B·2

## PREAMBLE

The purpose of this Power House Maintenance Modification Agreement ("PHMMA" or "Agreement") is to insure that all contracted maintenance work performed at Commonwealth Edison Company Power Generating Facilities shall proceed economically, efficiently and continuously, without interruption and with due consideration for the protection of labor standards, wages and working conditions. The parties hereto hereby do agree to establish and put into practice effective and binding methods for the settlement of all misunderstandings, disputes or grievances that may arise between the Contractor and any Union or its members to the end that the Owner, Contractor and Union(s) are assured of complete continuity of operation without slowdown or interruption of any kind and that labor-management harmony is maintained. It is further agreed between the parties that the terms, conditions and provisions of this Agreement shall supersede those of all other collective bargaining agreements and that this Agreement represents a complete and total understanding between the parties signatory hereto.

This Agreement is entered into by and between those parties who have signed a PHMMA Adherence Agreement. This PHMMA is for the performance of power house maintenance, modification, repair and renovation work (hereinafter referred to as Work) for Commonwealth Edison Company (hereinafter referred to as Owner).

## ARTICLE 1
## MANAGEMENT RIGHTS

1-1.    The Unions understand that the Contractor is responsible for performing the work required by the Owner. Therefore, the Contractor has the complete authority and right to:

(a)    Plan, direct, and control the operation of all work.

(b)    Hire and lay off employees as the Contractor deems appropriate to meet work requirements and/or skills required. The Contractor may hire key employees by name who have special skills or who have previous contract maintenance-modification experience with said Contractor. In such cases, local exclusive referral systems where applicable shall prevail.

(c)    Transfer employees with special skills or qualifications and/or employees from jobs where forces are being reduced to jobs where forces are being increased, without restriction or limitations. In such cases, local exclusive referral systems where applicable shall prevail.

(d)    Determine Work methods and procedures.

(e)    Determine the need for a General Foreman and the number of Foremen; require Foremen to work with their tools when, in the Contractor's opinion, this is advisable. The Contractor shall provide adequate and competent, direct supervision on the job. When established for a craft, one (1) top hourly craft supervisor shall be guaranteed forty (40) hours per week and may be required to remain on the job at the request of the Owner.

(f)    Require all employees to observe the Contractor's and/or Owner's rules and regulations consistent with the Agreement.

(g)    Require all employees to observe all safety regulations prescribed by the Contractor and/or Owner and to work safely.

(h)    Discharge, suspend, or discipline employees for proper cause.

1-2.    The Contractor may, if so desired, maintain a variety of skills within the Contractor's group of employees in order to be prepared with skills and/or supervision for any type of Work that may arise.

1-3.    It is understood that all employees will work together harmoniously as a group and as directed by the Contractor.  Employees will also cooperate with and follow directions of Owner representatives in case of emergency, as required by the contractor.  This is not to be construed under regular operating conditions as a Contractor's prerogative to assign employees out of their regular skill classification.

1-4.    The Unions understand the extreme importance of keeping operating equipment and units running at all times.  The Unions also understand that the loss of production and the cost of repairs together create a great loss to the Owner.  Therefore, the Unions will encourage and advise the employees to exhaust every effort, ways and means to perform work of good quality with high productivity.  The Contractor and the Unions recognize the necessity for eliminating restrictions and promoting efficiency, and agree that no rules, customs or practices shall be permitted which limit production or increase the time required to do the Work, and no limitation shall be placed upon the amount of Work which an employee shall perform, nor shall there be any restrictions against the use of any kinds of machinery, tools or labor-saving devices.

1-5.    It is understood by the Contractor and agreed to by the Unions that the employees of the Contractor will perform the Work requested by the Contractor without having any concern or interference with any other work performed by any employees who are not covered by this Agreement.

        It is understood that all maintenance Work not done by Commonwealth Edison Company employees is to be done by signatory unions except for technical specialties.

1-6.    Questions arising over the application and intent of this Agreement are subject to review by the Power House Maintenance Modification Committee to determine whether or not there has been exploitation of stipulated prerogatives.  The Power House Maintenance Modification Committee shall function under the Memorandum Of Understanding adopted from time to time by said Committee which is, and shall be, incorporated herein.

## ARTICLE 2
## UNION SECURITY AND REFERRAL

2-1.    The Unions are recognized by the Contractor as a source of employment referrals.  The appropriate Unions will be contacted and shall refer all applicants for employment to this project according to the standards or criteria uniformly applied to any maintenance project in the area.

2-2.    The Work that the Contractor performs may involve an operating unit that in all cases must be kept running.  This situation means that some of the Work is of an emergency nature, and therefore, will require at times the acceptance of extreme fluctuations in the labor demand.  The Unions, by this Agreement, completely understand the necessity of these extremes and agree to make every effort to fulfill the manpower requirements of the Contractor.

2-3.    All employees hired by the Contractor shall, as a condition of employment, become and remain members in good standing of the appropriate Union within seven (7) days following the date of their employment.

2-4.    The Contractor agrees to be bound by the hiring practices in the local area not inconsistent with the terms of this Agreement.

## ARTICLE 3
## NON-DISCRIMINATION

3-1.    The Unions and the Contractor shall not discriminate against any employee or applicant for employment because of race, creed, color, sex, age, or national origin.

## ARTICLE 4
## SCOPE OF WORK

4-1.    This Agreement covers only that Work assigned by the Owner to the Contractor and performed by the employees of the Contractor covered by this Agreement.

4-2.    The Unions and the Contractor understand that the Owner may choose to perform or to contract out any part of the Work necessary on a project.

4-3.    It is understood that when the Contractor subcontracts any Work, the subcontractor shall be required to execute a PHMMA Adherence Agreement except as otherwise provided herein.  This procedure shall apply to all tiers of subcontracting.

## ARTICLE 5
## DEFINITION OF MAINTENANCE-MODIFICATION

5-1.    Maintenance-modification shall be work performed for the modification, repair, and renovation of property, machinery, systems, equipment, within the limits of the plant property at locations so noted.

5-2.    The term "modification", used within the terms of this Agreement and in connection with maintenance-modification, is Work required to add to or improve existing systems or facilities.

5-3.    The word "repair", used within the terms of this Agreement and in connection with maintenance-modification, is Work required to restore, by replacement of parts, existing facilities to efficient operating condition.

5-4.    The word "renovation", used within the terms of this Agreement and in connection with maintenance-modification, is Work required to improve and/or restore, by replacement or revamping of parts, existing facilities to efficient operating conditions.

5-5.    In the event that a dispute arises as to whether a Work operation is within the scope of this Agreement, the matter shall be referred to the Power House Maintenance Modification Committee for resolution.

## ARTICLE 6
## GRIEVANCE PROCEDURE

6-1.    Local area grievance/arbitration forums shall not be used to interpret terms, conditions, or provisions of this Agreement.  Such determinations are vested exclusively within the procedures of the Power House Maintenance Modification Committee.

6-2.    However, any and all grievances that involve whether an employee has been discharged, suspended or disciplined for proper cause shall be resolved by the procedures established by the Union for use in the local area, except to the extent that such grievances require the interpretation of other terms, conditions or provisions of this Agreement.  In the event that no local grievance procedure exists, or it is not available for some reason, the Contractor and the Union may submit a grievance for final and binding resolution under the procedures of the Power House Maintenance Modification Committee.

## ARTICLE 7
## WORK ASSIGNMENTS

7-1.    The signatories to this Agreement concur with the concept that Work Assignments cannot and shall not interfere with the efficient and continuous operation required in the successful application of the intent of this Agreement.

7-2.    In the event that an emergency arises, or a situation where an individual or individuals receive their administrative limit of radiation during the shift that would not warrant "call in" of other men, or others could not be reached, the Contractor shall have the right to assign those on the shift to such emergency work which is necessary. The Contractor agrees that in such cases where practical the Work will be assigned on the basis of craft jurisdiction.

7-3.    The Contractor and Union(s) agree to a composite crew in an emergency situation. Emergency work shall be defined as non-scheduled outages not to exceed forty-eight (48) hours.

7-4.    Work assignment disagreements arising under the provisions of this Agreement which do not involve jurisdictional disputes shall be referred to the Power House Maintenance Modification Committee for resolution.

7-5.    The Contractor and Union(s) agree that with regard to work assignments the requirements of established apprenticeship programs shall be recognized for apprentice employees.

## ARTICLE 8
## CRAFT SITE REPRESENTATIVES

8-1.    A Craft Site Representative may be a qualified workman appointed by his Craft Business Representative. The Craft Site Representative shall be a working Journeyman on the job and shall provide qualified leadership in maintaining continuous, uninterrupted work. The Craft Site Representative shall be the last employee of the Craft to be laid off at the conclusion of the job provided that the employee is qualified to perform the required work.

## ARTICLE 9
## LOCAL UNION REPRESENTATIVES

9-1.    Officials of any signatory Unions shall be provided access to projects covered by this Agreement.

## ARTICLE 10
## WAGE RATES AND PAY

10-1.    Wage rates shall be 100% of the base wage scales, excluding fringe benefits, contained in the appropriate local or areas agreements which have been negotiated by the recognized bargaining agents.

10-2.    Fringe benefits as negotiated in local or area collective bargaining agreements shall be paid in addition to specified wage rates. This includes welfare funds, apprentice training funds, pension funds, and other monetary funds.

Revised 12/15/94                                          (4)

With regard to fringe benefits, the Contractor adopts and agrees to be bound by the written terms of legally established trust agreements specifying the detailed basis on which payments are to be made into, and benefits paid out of, such trust funds. The Contractor authorizes the parties to such trust agreements to appoint trustees and successor trustees to administer the trust funds and hereby ratifies and accepts the trustees so appointed as if made by the Contractor. Nothing contained in this language is intended to require the Contractor to become a party to, nor be bound by a local collective bargaining agreement, except for the employee benefit fund contributions as required herein, nor is the Contractor required to become a member of any employer group or association as a condition for making such contributions.

10-3.    For the purpose of this Agreement, wage premiums established under local and/or national collective bargaining agreements affecting the Work such as hazard pay, acid pay, high or low work, radiation area, wearing of a dosimeter, protective clothing or respirator and similar premiums shall not be applicable to this Agreement.

10-4.    Under the terms of this Agreement, travel allowance, mileage or pay for travel time shall not be recognized.

10-5.    Wages will be paid weekly. The payroll period to close so that no more than five (5) days will be held back and payments to be made before the end of the employee's shift, and otherwise in accordance with the local Agreements of each craft.

## ARTICLE 11
## DAY WORK SCHEDULES

11-1.    The standard work day shall be an established consecutive eight (8) hour period between the hours of 7 a.m. and 5 p.m. exclusive of a thirty (30) minute lunch period. Forty (40) hours per week shall constitute a week's work, Monday through Friday, inclusive.

On any project when the job conditions dictate a change in the established starting time and/or a staggered lunch period on certain work of the project or with individual Crafts, the Contractor and the Unions involved shall mutually agree to such changes.

11-2.    All time before and after the established day work of eight (8) hours, Monday through Friday, and all time on Saturday shall be paid for at the rate of time and one-half. All time on Sundays and Holidays stated in Article 13 shall be paid for at the rate of double time.

## ARTICLE 12
## TEMPORARY SHIFT WORK CONDITIONS

12-1.    When so elected by the Contractor, multiple shifts on a temporary basis of at least three (3) consecutive work days duration may be worked. When two or three shifts are worked, the first or day shift shall be established on an eight (8) hour basis; the second shift shall be established on a seven and one-half (7½) hour basis; and the third shift shall be established on a seven (7) hour basis.

Unnecessary fluctuation of the three (3) consecutive work day provision shall be deemed a violation of the temporary shift provisions to circumvent the regular overtime provisions of this Agreement and, if so deemed by the Power House Maintenance Modification Committee shall result in all employees on such shifts being paid at the appropriate overtime rates.

The determination of the start of multiple shifts is by mutual agreement. If it is necessary to use employees from a previous shift within a twenty-four (24) hour period, overtime provisions of Article 11 shall apply and shall be considered the beginning of the three (3) consecutive work days.

12-2.    The pay for the second and third shifts shall be equivalent to eight (8) times the employee's straight time hourly rate.

12-3.    When by mutual agreement it is deemed necessary to operate ten (10) hour shifts, these shifts shall be on a temporary basis of at least three (3) consecutive days. The first shift or day shift shall be paid eight (8) straight hours and two (2) hours at the applicable overtime rate with an unpaid lunch period. The second shift or night shift shall be paid eight (8) straight time hours and two (2) hours at the applicable overtime rate with a paid lunch period.

12-4.    A twelve (12) hour shift shall not be worked except in extreme emergencies and then only by mutual consent of the Contractor and Unions. In the event that it is deemed necessary to work on a twelve (12) hour basis, the shifts shall be of a temporary basis of at least three (3) consecutive days. The first shift or day shift shall be paid eight (8) straight hours and four (4) hours at the applicable overtime rate. Included in this twelve (12) hour shift is a paid one-half (1/2) hour lunch period during the first eight (8) hours and a paid twenty (20) minute lunch break during the four (4) hour overtime period. The second shift or night shift shall be paid in the same manner.

12-5.    There shall be no other shift premiums. The premium hours of all shifts shall be after the initial eight (8) hours are worked.

12-6.    Other shift work arrangements may be implemented by mutual agreement between the Contractor and the Union.

## ARTICLE 13
## HOLIDAYS

13-1.    The following six (6) days shall constitute the legal holidays within the terms of this Agreement and will be celebrated on nationally recognized days, except for mutually agreed upon changes through the Power House Maintenance Modification Committee:

New Year's Day        Labor Day

Memorial Day          Thanksgiving Day

Independence Day      Christmas Day

## ARTICLE 14
## REPORTING TIME AND CALL-INS

14-1.    Reporting Pay:  When an employee or new hire reports to work and is not given the opportunity to work because work was not available, and the employee was not notified before the completion of the previous day's work, the employee shall be paid two (2) hours reporting time.

When employees start to work they shall be paid not less than four (4) hours and, if they work beyond four (4) hours, they shall be paid for actual time worked.

If any employee refuses to start or stops work on the employee's own volition, the minimums set forth above shall not apply.

14-2.    Call-Ins:  A Call-In shall be defined as notification to an employee, by whatever means, to report for work outside of the employee's regularly scheduled shift. Call-Ins as defined above shall be paid in accordance with one of the following:

(a)     A Call-In prior to and continuous with an employee's regularly scheduled shift shall be paid for on the basis of hours actually worked at the applicable overtime rate.

(b)     When an employee is called in to work at or after the established starting time on Saturday or Sunday, the employee's scheduled day off, or holidays, the employee shall be paid not less than four (4) hours at the applicable overtime rate for that day, and, if the employee works past the lunch period, the employee shall be paid for hours worked plus a paid lunch period.

## ARTICLE 15
## TOOL ROOMS

15-1.   The Contractor and the Unions agree that it shall be the Owner's prerogative to maintain and operate a general, centrally located tool room and warehouse. The Contractor and the Unions agree that the manpower required for operation of a Contractor centrally located tool room and warehouse shall be employed directly by the Contractor.

15-2.   If it is the intention of the Contractor to establish area tool rooms and warehouses as required for efficient service in the plant, these area tool rooms and warehouses will be manned under the terms of this Agreement.

## ARTICLE 16
## FIRST AID AND SAFETY

16-1.   The employees covered by the terms of this Agreement shall at all times while in the employ of the Contractor be bound by the safety rules and regulations as established by the Owner and/or Contractor. These rules and regulations are to be posted at conspicuous places throughout the project.

## ARTICLE 17
## PROJECT RULES

17-1.   It is agreed that project rules and regulations will be limited to safety, security and mandatory requirements and will be prepared and distributed among employees by the Contractor, provided such rules do not conflict with any terms of this Agreement.

17-2.   It is further agreed that violation of these project rules and regulations is direct and just cause for disciplinary action, including immediate discharge, subject to Article 6.

## ARTICLE 18
## PROTECTIVE LEGISLATION

18-1.   All employees covered by this Agreement shall have the protection of all existing Federal, State and Local Laws applicable to employees in general.

Revised 12/15/94

## ARTICLE 19
### GENERAL SAVINGS CLAUSE

19-1.    Any provisions in this Agreement which are in contravention of any Federal, State, Local or County regulations or laws affecting all or part of the limits covered by this Agreement shall be suspended in operation within the limits to which such law or regulation is in effect. Such suspension shall not affect the operation of any such provisions covered by this Agreement to which the law or regulation is not applicable; nor shall it affect the operation of the remainder of the provisions of the Agreement within the limits such law or regulation is applicable.

19-2.    It is mutually agreed between the Contractor and the Unions that if any liability by signatory Unions to this Agreement should arise, such liability shall be several and not joint.

## ARTICLE 20
### WORK STOPPAGES

20-1.    There shall be no strikes, work stoppages, picketing, or slowdowns by the Unions or employees against the Contractor or any other contractor performing work on the project site which would affect the terms of this Agreement.

        There shall be no lockouts by the Contractor.

## ARTICLE 21
### PROCEDURE FOR RESOLUTION
### OF JURISDICTIONAL DISPUTES

21-1.    When a jurisdictional dispute over an assignment of work arises, the Local Union challenging the assignment or the Contractor directly affected by the dispute shall notify all affected parties; i.e., Unions and Contractor, by telegram or fax that a dispute exists.

21-2.    Within two (2) days after receiving such notice, the Contractor and Local Unions shall meet to attempt to resolve the dispute.

21-3.    In the event that the dispute is not resolved at said meeting, the matter shall be referred to the International Unions with which the local Unions are affiliated and they and the Contractor shall have the opportunity to resolve the dispute.

21-4.    If the dispute is not resolved pursuant to the provisions of Article 21-3, within five (5) days of the notice set forth in Article 21-1, the matter shall be referred by telegram or fax by any Union or Contractor directly involved in the dispute for arbitration to the Permanent Impartial Umpire designated to resolve other issues under the PHMMA Agreements. This individual will also serve as impartial Umpire to resolve jurisdictional disputes under this procedure.

21-5.    The Arbitrator will set and hold a hearing within seven (7) days of the referral to him. The Arbitrator shall notify the Contractor and the local unions, and the appropriate International Unions by telegram or fax of the place and time chosen for the hearing. A failure of any party or parties to attend said hearing without good cause, as determined by the Arbitrator, shall not delay the hearing of evidence or issuance of a decision by the Arbitrator. The time periods set forth in Sections 21-1 through 21-5 can be extended by mutual agreement of the parties in writing.

21-6.   The Arbitrator shall issue his decision within three (3) days after the case has been closed.  The decision of the Arbitrator shall be final and binding on all parties to the dispute.

21.7.   In rendering his decision, the Arbitrator shall determine first, whether a previous decision or agreement of record between the parties to the dispute governs.  If the Arbitrator finds that the dispute is not covered by an appropriate or applicable decision or agreement of record, he shall then consider whether there is an applicable agreement between the crafts governing the case.  If no such agreement is in effect, the Arbitrator shall then consider the established trade practice and prevailing practice in the locality.  Because efficiency, cost or continuity, and good management are essential to the well-being of the industry, the Arbitrator shall consider the interest of the Owner, the consumer and the past practices of the Contractor.

21-8.   The Arbitrator is not authorized to award back pay or any damages for a misassignment of work.  Nor may any party to this Procedure bring an independent action for back pay or any other damages, based upon a decision of an Arbitrator.

21-9.   Each party to the arbitration shall bear its own expense for the Arbitration.  Arbitration services will be paid for by the Owner.

21-10.  During the existence of the PHMMA Agreement, there shall be no strikes, work stoppages, or picketing arising out of any jurisdictional dispute.

## ARTICLE 22
## PRE-JOB CONFERENCE

22-1.   In keeping with the spirit and intent of the Agreement, the Contractor agrees to provide the Unions with the opportunity for a pre-job conference prior to starting Work on the project.

## ARTICLE 23
## DURATION OF AGREEMENT

23-1.   This Agreement shall be in full force and effect for a period of one (1) year from the date of the Contractor's signature on the PHMMA Adherence Agreement and shall continue from year to year thereafter unless a sixty (60) day notice is given by the Contractor or Unions.

TOTAL P.10

# RESTATED AGREEMENT

### AND

# DECLARATION OF TRUST

#### CREATING

# LABORERS' PENSION FUND

With Amendments Through
May 31, 2002



EXHIBIT
B-3

(b)    To enforce the provisions of the Pension Plan and the rules and regulations adopted by the Trustees in a uniform manner with respect to individuals similarly situated.

(c)    To determine questions arising under the Pension Plan or this Agreement, including the power to determine the rights of Employees and their Beneficiaries, and their respective benefits, and to remedy ambiguities, inconsistencies or omissions.

## ARTICLE VII

## FUNDING PENSION PLAN BENEFITS

Section I.    IN GENERAL.    In order to fund the benefits provided under the Pension Plan, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees at the times required by that agreement.  The rate of contributions shall be determined by the applicable Collective Bargaining Agreement or Participation Agreement, together with any amendments, supplements or modifications thereto.  Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be the same as the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union which covers Employees performing similar work. No

-24-

Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the provisions of a Collective Bargaining Agreement or Participation Agreement and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer has entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the

liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10%, waiving the necessity of any additional proof thereof.  In addition, the delinquent contributions and any payments owed by an Employer pursuant to an installment agreement, shall bear interest up to the prime rate of interest plus two points charged by the Fund's custodian bank (or any other bank selected by the Trustees)  or such other lawful amount as determined by the Trustees from the due date until totally satisfied.  The Trustees are hereby given the power and authority to delegate the collection of contributions to a Collection Committee, which, in its discretion, may assess a lesser or greater amount or waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee  and to compromise claims for delinquent contributions and related  liabilities and collection costs where appropriate to settle cases favorably for the Fund.  The Collection Committee may include trustees of the Laborers' Welfare Fund as members of the Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including court fees, audit fees, investigative costs, etc. The term "reasonable attorneys' fees" as used herein shall mean all

-26-

attorneys' fees in the amounts for which the Trustees become legally obligated including recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority, in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees, in lieu of any cash deposit, a bond in an amount not less than Five Thousand Dollars ($5,000.00) or in an amount consistent with the terms of the current collective bargaining agreements. In the event an Employer is repeatedly delinquent in its contribution payments to the Pension Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current collective bargaining agreements, in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3.   REPORT  ON  CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such

other information as the Trustees may reasonably require in connection with the administration of the Trust and Pension Plan. The Trustees may at any time have an audit made by an independent certified public accountant or its representatives of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures developed and communicated by the Administrator from the beginning of such Employer's participation in the Pension Fund forward unless given written authorization by the Administrator upon request to destroy said record. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ARTICLE VIII

## FILING CLAIMS AND REVIEW OF DENIALS OF CLAIM

Section 1.    FILING OF A CLAIM.    Claims for the payment of any benefits provided by the Pension Plan shall be filed, in writing, in accordance with the Rules and Regulations set forth in Article 7 of the Pension Plan.

-28-

## ADDENDUM  A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1.   Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2.   Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3.   Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4.   Cash disbursement journals and general ledgers.

5.   Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6.   Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7.   Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8.   Daily time records filed by employees or supervisors.

9.   Source documents and lists of job codes and equipment codes.

10.   Certified payrolls for public sector jobs where such payrolls are required.

11.   Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12.  Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13.  If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above.  However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above.  In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.  The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

## LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1.  Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2.  Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof.     Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3.  When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4.  An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers.** New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers.** Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**.  If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit.  An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**.  Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods.  If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**.  Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

2

# RESTATED AGREEMENT AND DECLARATION OF TRUST OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

Restated through
July 1, 2003



EXHIBIT
B-4

1

## ARTICLE VI
## EMPLOYER CONTRIBUTIONS

Section 1.  IN GENERAL.  In order to fund the Benefits provided for by this Agreement, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees pursuant to regulations established by the Trustees at the times required by that agreement.  The rate of contributions shall be determined by the applicable Collective Bargaining Agreements or Participation Agreements, together with any amendments, supplements or modifications thereto.  Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation Agreement or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be not less than the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union having jurisdiction over the geographic area in which the covered Employees perform their work.  No Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the foregoing provisions of this Section and any such contract or agreement shall be null and void.  It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer had entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement.  All contributions shall be paid in the manner and form required by the Trustees.

Section 2.  DEFAULT IN PAYMENT OF CONTRIBUTIONS.  Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments.  The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity.  Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment.  The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed.  All Employers party to or otherwise bound by this Agreement acknowledge that the liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10% waiving the necessity of any additional proof thereof.  In addition, the delinquent contributions and any payments by the Employer pursuant to an installment agreement, shall bear interest, up to the prime rate plus two points, charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied.  The Trustees are hereby given the power and authority, in their discretion, to assess a lesser amount or to waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee of the Board of Trustees and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Welfare

Fund. The Collection Committee may include trustees of the Laborers' Pension Fund as members of such Collection Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, or refuses to provide the records required to be kept by contributing employers or submit to an audit, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including but not limited to, court fees, audit fees and investigative costs. The term "reasonable attorneys' fees" as used herein shall mean all attorneys' fees in the amounts for which the Trustees become legally obligated for actions seeking delinquent contributions, to compel an audit, or for recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees in lieu of any cash deposit a bond in an amount not less than Five Thousand Dollars ($5,000.00), or in an amount consistent with the terms of the current Collective Bargaining Agreement to which the Employer is subject. In the event an Employer is repeatedly delinquent in its contribution payments to the Welfare Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current Collective Bargaining Agreements in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3.    REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such other information as the Trustees may reasonably require in connection with the administration of the Trust. The Trustees may at any time have an audit made by an independent accounting firm of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures from the beginning of such Employer's participation in the Trust until given written authorization by the Administrator, upon request, to destroy said records. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning the Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

# ADDENDUM  A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1.  Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2.  Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3.  Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4.  Cash disbursement journals and general ledgers.

5.  Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6.  Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7.  Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8.  Daily time records filed by employees or supervisors.

9.  Source documents and lists of job codes and equipment codes.

10.  Certified payrolls for public sector jobs where such payrolls are required.

11.  Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

1

12.  Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13.  If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above.  However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above.  In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.  The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

## LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers.** Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

2

AGREEMENT AND DECLARATION OF TRUST
ESTABLISHING
THE CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY
TRAINING TRUST FUND

THIS AGREEMENT AND DECLARATION OF TRUST, made and entered into as of the 1st day of June, 1986 by and between THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, A.F.L.-C.I.O., representing its affiliated Local Unions and the members thereof (the "Council") and the BUILDERS' ASSOCIATION OF CHICAGO, the UNDERGROUND CONTRACTORS ASSOCIATION, and the ILLINOIS ROAD BUILDERS' ASSOCIATION, and all other employer associations (the "Associations") who have hereto bargained or may hereafter bargain or enter into collective bargaining agreements or other agreements with the Union, its local affiliates, or with representatives of this Trust, for and on behalf of themselves and their respective members who by virtue of their said membership or otherwise are parties to collective bargaining agreements with the Union or any of its local affiliates or are parties to this Agreement or are otherwise bound to the provisions hereof as hereinafter provided, and other employers in the building and construction industry who may not be members of any association but who are included in the term "Employers" (as defined in Section 2 of ARTICLE I) and agree to be bound by this Agreement or who are otherwise so bound as provided as set forth in Section 2 of ARTICLE I;

WITNESSETH:

(1)  The Employers are parties to a collective bargaining agreement, or supplements thereto, with the Council which requires

-1-

Employer contributions of a certain sum per hour per Employee to a training fund provided in a program to be created for partici-pating employees and established by this trust agreement.

(2) the parties have agreed that such contributions shall be payable to and be deposited in the Trust Fund created and established by this Trust Agreement.

NOW, THEREFORE, in consideration of the premises and in order to establish and provide for the maintenance of said Trust Fund to be known as "THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY TRAINING TRUST FUND" hereinafter referred to as the "Trust Fund," it is mutually understood and agreed as follows.

## ARTICLE I

## Definitions

Unless the context or subject matter otherwise requires, the following definitions shall govern in this Trust Agreement.

Section 1.  WRITTEN AGREEMENT

The term "Written Agreement" shall mean any agreement in writing which specifies the detailed basis on which contributions shall be made to this Trust together with any modification, amendment or renewals thereof, including but not limited to Collective Bargaining Agreements, memoranda of understanding which incorporate by reference Collective Bargaining Agreements or this Agreement, report forms in accordance with which contributions are made and which obligate the Employer to the provisions of this Agreement, or any other agreement obligating the Employer signatory thereto to participate in or be bound by this Agreement.

signatory association, nor any officers, agent, employee or committee member of the Employers, or of any signatory association shall be liable to make contributions to the Fund or be under any other liability to the Fund or with respect to the Training Program, except to the extent that he may be an individual Employer required to make contributions to the Fund with respect to his or its own individual or joint venture operations, or to the extent he may incur liability as a Trustee, as hereinafter provided. The liability of any individual Employer to the Fund, or with respect to the Training Program shall be limited to the payments required by any written agreement with respect to his or its individual or joint venture operations, and in no event shall he or it be liable or responsible for any portion of the contributions due from other individual Employers with respect to the operations of such Employers. The individual Employers shall not be required to make any further payments or contributions to the cost of the operations of the Fund or of the Training Program, except as provided in Section 8 of this Article.

Section 6. Neither the Employers, any signatory association, any individual Employer, the Council, nor any employee shall be liable or responsible for any debts, liabilities or obligations of the Fund or the Trustees.

Section 7. Contributions to the Fund shall be due and payable to the principal office of the Fund and shall be made in regular monthly installments except as otherwise herein provided in Section 9 of this Article II. Each contribution to the Fund shall be made promptly, and in any event on or before the 10th day

of the calendar month in which it becomes due and payable.  Each
monthly contribution shall include all payments which have accrued
in the interim for work performed up to the close of the
Employer's payroll period ending closest to the last day of the
preceding calendar month.  Each monthly contribution shall be
accompanied by a report in a form prescribed by the Board of
Trustees.

Section 8.  The parties recognize and acknowledge that the
regular and prompt payment of Employer contributions and reports
to the Fund are essential to the maintenance of the Fund and that
it would be extremely difficult, if not, impracticable, to fix the
actual expense and damage to the Fund and to the Training Program
which would result from the failure of an Employer to pay such
monthly contributions in full within the time provided above.
Therefore, if any Employer is delinquent in remitting its
contributions within the time specified in Section 7 of this
Article, the amount of damage to the Fund and Training Program
resulting from failure to make reports or pay contributions within
the time above specified shall be presumed to be the sum of ten
percent (10%) of the amount of the contribution due for each
delinquent report or contribution.  This amount shall be added as
liquidated damages upon the day immediately following the date on
which the report or the contribution or contributions become
delinquent.  Delinquent contributions and penalties shall also bear
interest at a rate up to the prime rate of interest as recog-
nized by the First National Bank of Chicago or such other lawful
amount as determined by the Trustees from the due date until

delinquency is totally satisfied.  The Trustees, however, in their
discretion, for good cause (Trustees shall have sole right to
determine what shall constitute good cause) shall have the right and
power to waive all or any part of any sums due the Fund as liquidated
damages.  Failure by any Employer to make the required payments
hereunder shall be deemed a breach of the written agreement
by the Employer and be subject to economic action by the Council in
addition to the other remedies as provided herein.  The Trustees may,
at their option, also take legal action to collect all delinquent
amounts owing to the Fund, and parties agree that if the delinquent
account of any Employer is referred to an attorney for collection,
such Employer shall immediately become liable for a reasonable sum
for the attorneys' fee together with an amount equal to all costs
incurred by the Trustees in commencing or prosecuting legal action in
any Court.  In such legal action, venue shall be laid at Cook County,
Illinois, as the Fund is administered in such county.

Section 9.  In the case of certain Employers who have defaulted
on payments in the past, or who otherwise give the Trustees
reasonable cause to feel insecure as to future contributions, the
Trustees shall have the power to require a bond for the payment of
contributions.

ARTICLE III

Board of Trustees

Section 1.  Except as otherwise specifically provided, the
Fund shall be operated and administered by a Board of Trustees
whose membership shall consist of three persons appointed as
trustees by the Association (known as the "Association Appointed

**CERTIFICATE OF SERVICE**

The undersigned attorney of record certifies that he caused a copy of the foregoing Motion for Order of Default to be served upon the following individual on March 19, 2008, via first class US Mail, postage pre-paid.

Trotter Landscape Company, Inc.
John V. Hanson, Registered Agent
1802 N. Division St.
#04 POB 825
Morris, Illinois 60450

/s/ Jerrod Olszewski